FILED

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

02 SEP 30 PM 1: 24

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **DR. MAWIA MOHAMED ELJACK,** | ] |
| Plaintiff(s), | ] |
| vs. | ] CV-01-N-2811-S |
| **SECURITY ENGINEERS, INC.,** | ] |
| Defendant(s). | ] |

ENTERED
SEP 3 0 2002

**Memorandum of Opinion**

This cause is before the court for consideration and disposition of the following matters:

(1) Plaintiff's "Motion for Orders," filed November 30, 2002; Plaintiff's "Motion for Orders counteracting the Misleading claims And The Stalling Requests of The Anti-Moslims lawyers In This Constitutional Case,"[1] filed March 8, 2001; Plaintiff's "Motion For Orders [Under the Titled Complaint: The Moslims Charter] A More Definite Statement of Claims:," filed April 3, 2002; Plaintiff's motion for summary judgment, filed April 26, 2002; (Doc. 12, 27, 28, and 34)

(2) Defendant's motion for summary judgment, filed May 30, 2002; and Defendant's motion to strike plaintiff's entire initial reply or portions thereof, filed July 3, 2002. (Doc. 38, 45, and 47).

---

[1] Where the court deemed it necessary to quote from Dr. Eljack's writings, it has endeavored to replicate the style exactly but has not repeatedly stated that the punctuation, capitalization, italicization, etc. is the same as the original. In the circumstances of this case, such indications would only serve to further obscure the meaning.



For the reasons set out herein, Plaintiff's motions and submissions other than his initial complaint will be STRICKEN, Defendant Security Engineer's motion for summary judgment will be GRANTED, and the entire action will be dismissed.

**I.     Background.**

Since the inception of this action, the pro-se plaintiff, Mawia Mohamed Eljack, has persisted in filing voluminous documents which have been unresponsive to the court's recommendations or orders. Despite the court's efforts to restrain Dr. Eljack's enthusiasm for hyperbole and to obtain some coherent statement of his claim(s), he has persisted in insisting he is bringing this action to vindicate the rights of all taxpaying Moslem citizens of the United States and to incorporate the fundamental teachings of Islam into the workplace policies of all U.S. employers.

Dr. Eljack commenced this action on November 2, 2001, claiming he was compelled to leave his employment with Security Engineers because he was coerced "to shave [his] beard and abandon the rules of Islamic faith forcibly." (Doc. 2). A judge of this court granted his petition to proceed in forma pauperis and ordered him to amend his complaint within 30 days, directing that the amended complaint comply with the Federal Rules of Civil Procedure and, in particular, refer to the federal statute or statutes being invoked. On November 9, 2001, Dr. Eljack responded with the first of several "Moslims Charters," a 46 page document in which he complained he has been unable to find perfect justice in the secular justice system of the United States; accused corporate America, in general, of unconstitutionally "terrorizing" Moslim employees and Security Engineers, in particular, of attempting to murder him in the service of the federal government; and accused President

Bush and the Birmingham Islamic Society, with the consent of the Supreme Court, of concealing financial information that was related to the September 11, 2001, attacks. (Doc. 3). Despite the inflammatory and threatening nature of this and subsequent submissions, the court discerned the kernel of a cognizable claim or claims and gave Dr. Eljack several opportunities to state his claims in a concise and coherent manner. (Doc. 26, 31, 35, 41). With the exception of Document 48,[2] every document subsequently filed in this action by Dr. Eljack has been replete with invective and hyperbole and completely unresponsive to the court's directions and orders. (Doc. 12, 25, 27, 28, 30, 33, 34, 42, 50). Furthermore, despite the court's directions, Dr. Eljack has persisted in presenting "constitutional" claims on behalf of all Moslim citizens and exhorting the court to require corporate America to provide, *inter alia*, "Islamically fit" restrooms, furnish Islamic Prayer Halls, "non-Christmas" bonuses, fully paid vacation times during the Hajj and Omra seasons, a yearly "Moslim Awareness Month," and Islamic sensitivity training. (Doc. 33). Dr. Eljack's submissions have culminated in a document ominously entitled "Terrorism-101," filed on September 16, 2002. (Doc. 50).

Due to Dr. Eljack's total disregard for this court's requirement that he clearly and concisely state his claim, and in view of his penchant for using this court as a forum for his inflammatory rhetoric, all of Dr. Eljack's submissions will be stricken, with the exception of the initial complaint (Doc. 2) and the documents appended to it. (Doc. 12, 25, 27, 28, 30,

---

[2] In Document 48, Dr. Eljack concisely and clearly stated that he needed additional time to prepare his reply because he had been surprised by the speed of defendant's submission and had lost response time due to the intervening holiday. Despite the court's conclusion that Dr. Eljack was not scheduled to submit a reply, Document 48 was, nevertheless, notable in that it was admirably restrained and brief.

3

33, 34, 42, 50). *See* Fed. R. Civ. P. 12(e). The only claims the court will consider are those set out in Document 2 and in the EEOC complaint appended thereto. Accordingly, Dr. Eljack is limited to the claims that: (1) he was denied promotions to management positions which were awarded to employees with less education and experience; (2) he was paid lower wages than similarly situated employees; (3) he was harassed and his work hours were reduced in retaliation for his complaint to management; and (4) he was forced to leave his employment because his employer demanded he shave his beard. Finally, as summarized below, the court has examined the documents appended to the stricken submissions and finds they add nothing to Dr. Eljack's complaint, nor do they provide evidentiary support for his claims.[3]

## II. Discussion.

The documents Dr. Eljack attached to his various submissions are, in most cases, redundant. The documents attached to the initial complaint (Doc. 2) include:[4]

A.  copies of pay stubs from June 8, 2001 showing a net pay of $668.54 and from August 11, 2001, showing a net pay of $279.64.

B.  an unverified statement dated June 30, 2001, from Earl Grant, who is otherwise unidentified, in which Mr. Grant averred that he and Eljack had what they thought

---

[3] Dr. Eljack did claim in an unverified statement that he would be able to prove his claims if he were granted discovery. However, he did not state what evidence he would expect to find, nor did he meet any of the other requirements of Rule 56(f) by showing that an order for discovery would be just in these circumstances. In particular, the court notes he has not identified a comparator though he claims he was the victim of disparate treatment at Security Engineers. Without a specified comparator, Security Engineers cannot properly participate in any meaningful discovery procedure.

[4] The documents appended to Dr. Eljack's other submissions continue in the same vein and similarly fail to address the basic problems with Dr. Eljack's claims as discussed in the opinion.

were good schedules, but their schedules were repeatedly changed to inconvenient times. Dr. Eljack's unverified statement to the same effect is included on the document.

C.    a copy of a page from the Security Engineers' Employee Handbook, which provides, *infer alia*, that "[b]eards are not permitted."

D.    Dr. Eljack's September 1, 2001, statement, "verified" by Mr. Elsayed Mohammed and Mr. Salah El Dareer, that he, "in the company of Mr. S and Mr. A" went to Security Engineers on August 29, 2001, and demanded that Mr. Don Bottom come out of his office and discuss "Discrimination and harassment issues," but Mr. Bottom refused to talk with him. Dr. Eljack added that, on that same date, he, Mr. S and Mr. A went to Southland Tube and demanded that Mr. John Montgomery reinstate him to the Security Job position at that facility, but Mr. Julian Swain, head of Security, told Dr. Eljack he was not reinstated.

E.    Dr. Eljack's "Officer's Daily Activity Report," for Southland Tube, dated July 4, 2001, and a similar report dated July 7, 2001, for Svedala Industries.

F.    "Communique No.2A" sent by Dr. Eljack to Don Bottom of Security Engineers on July 19, 2001, and a similar "Communique No.3A" sent on July 26, 2001, in which Dr. Eljack claimed he was harassed when field supervisors wrote him up on July 4th, 2001, and when he was asked to sign a policy book that other employees had not signed. He contended the harassment was the result of a complaint he sent Bottom on July 3.

G. An EEOC complaint, filed July 26, 2001, in which Dr. Eljack claimed Security Engineers denied him promotions and paid him lower wages than similarly situated employees because of his religion and national origin, and that when he complained of unfair treatment in a written statement of July 2, 2001, he was subsequently harassed by being closely monitored and having his work hours reduced.

H. "Communique No.4A," to Don Bottom, dated August 3, 2001, in which Dr. Eljack complained that unidentified co-workers were intoxicated at work and that he was only getting part-time hours and was paid less per hour than new employees.

I. "Communique No.5A" to Don Bottom, dated August 15, 2001, in which Dr. Eljack complained that his basic human rights were violated by Security Engineer's requirement that he conduct "clock rounds" in all kinds of weather and that, on August 3, 2001, he was detained in the Security Engineers Human Resources office "until I finish Signing for Security Engineers, Inc. its Discriminatory Policy that was not presented to me at the time this company employed me!" He also demanded more work hours at the highest paid account.

J. "Security Post Instructions," unidentified but presumably from Security Engineers, providing that "Security Officers shall follow all rules, instructions and guidance, as well as all formally established (though not necessarily written) procedures and practices that apply to their assigned post EXACTLY as written or established . . . simply because that is the way the Client wants things to be done!" Dr. Eljack has annotated the margin "A PARTNER IN OPPRESSION" with an arrow pointed to the final, underlined, phrase.

6

K.  Another unidentified page with margin annotations providing that patrol, "[t]hough not always pleasant since it must be maintained both day and night in all kinds of weather, . . . gets the job done."

L.  "Communique No.6A" to Don Bottom, undated but with a United States Postal Service stamp indicating it was mailed in September 2001, in which Dr. Eljack complained he was in the headquarters of Security Engineers on August 31, 2001, reading the "Discriminatory policy of Security Engineers" and was told at 5:05 p.m. that he would have to leave and make another appointment to finish reading and signing the policy. Whereupon, he "Said to Security Engineers, Inc.: you have removed me from work as of this Minute officially (*through a certified letter*)."

M.  A notice from the Alabama Unemployment Compensation Agency dated September 10 (but including no year) in which Dr. Eljack was told Security Engineers provided information to the agency claiming he "quit No call No shows."

N.  Diagrams or copies of a circular item identified as "Detex discs" and with the annotation in the margin, "Which One of The Above (DETEX-Disks) IS New (A Newly Fres Disk) AND Which One Is Used (A Used Filled-Out Disk) ?!?

O.  "Communique No.7A" to Don Bottom, dated unclearly but sent late in September 2001, in which Dr. Eljack complained that Security Engineers' representatives came to his apartment on September 27, 2001, and demanded that he return the gun issued to him by Security Engineers, whereupon Dr. Eljack refused and demanded that Don Bottom write him a letter "Recalling [him] from Layoff officially." Dr. Eljack stated that the representative ultimately "took off Running," and after he left, Dr. Eljack gave

7

       the gun to the police. Dr. Eljack concluded the document with a demand that he be recalled from layoff and stating that he was "readily available to perform work (Preferably) in the Areas of Quantitative and Qualitative Research Design for (increasing your business Profitability) and for the Financial assessment of your optimum business activities: (*Various Incomes Versus Various Expenditures.*)"

P.    "Officer's Daily Activity Report[s]" for client Svedala Industry, submitted by Ruben H. Ware on August 17, 2001, Dr. Eljack on August 18, 2001, Edna L. Steger on August 18, 2001, Dr. Eljack on August 19, 2001, Edna L. Steger on August 19, 2001, Edna L. Steger on August 20, 2001, Ruben Ware on August 21, 2001, Ruben Ware on August 22, 2001, Edna L. Steger on August 23, 2001, and Edna L. Steger on August 24, 2001.

Q.    A letter, deliver to Dr. Eljack on August 20, 2001, in which Security Engineers' Manager of Human Resources, M.T. Goyne, stated that Dr. Eljack had set three appointments to read and sign the acknowledgment form for the employee handbook, but had not yet completed the task. She informed Dr. Eljack that he was required to complete his review of the handbook "no later than August 31, 2001 at 5:00 p.m.," and concluded, "If you do not complete your review of the Security Engineers' Employee Handbook and sign the Acknowledgement Form by August 31, 2001 at 5:00 p.m., we will consider you to be in violation of company policy and will take appropriate action, including, but not limited to, not assigning you any further work at Security Engineers until you have completed your review of the Security Engineers' Employee Handbook and sign the Acknowledgment form."

R.  A letter, dated August 20, 2001, from Don Bottom to Dr. Eljack in which he acknowledged Dr. Eljack's complaints of "discrimination" and "harassment" but stated that unless Dr. Eljack could be more specific, and state "who, what, where, when, and why" nothing further could be done.

S.  "Communique No. 1-Z," dated September 20, 2001, and addressed to "The Managements of B.I.S. et al.," providing:

Subject: Applying for a High Ranking Position within your Organizations
In addition to all Managerial Openings within your various Organizations I am also interested in applying for the Teaching Position that you have announced publicly.  Please notify me of your response to this Simple request through certified mail!

T.  A second "Communique No.2-Z" adds: "I am also ready to perform Quantitative and Qualitative Research Design for the Financial assessment of your worldwide Profit and non-Profit Organizations (Various Incomes Versus Various Expenditures)!" Similar missives, addressed to the managements of "B. I. C. et al.," "M.A. et al.," "D.A. et al.," "QLC, et al.," are included.

U.  "Communique No.1-D," dated September 26, 2001, to Mr. Don Olive, identified as the CEO of Svedala Industries, Inc., in which Dr. Eljack states, "I am currently available to perform work in the areas of Quantitative and Qualitative Research Design for (increasing business profitability) and for the Financial assessment of your worldwide business activities.  Right now I am ready to join the workforce of Svedala Industries, Inc."

V.  "Communique No.1-C," addressed to Mr. Jeff Fisher, identified as the CEO of "Metal Management" and dated August 29, 2001, demanding reinstatement as a Security

|   |   |
|---|---|
|   | Engineers Security Guard at his facility. A second "communique" informs Mr. Fisher of Dr. Eljack's availability for Quantitative and Qualitative Research Design. |
| W. | "Communique No.1-B," addressed to Mr. John Montgomery, identified as the CEO of "Southland Tube, Inc.," and dated August 22, 2001, demanding reinstatement as a Security Engineers Security Guard at his facility. A second "communique" informs Mr. Montgomery of Dr. Eljack's availability for Quantitative and Qualitative Research Design. |
| X. | Police Department documentation dated September 27, 2001, showing Dr. Eljack deposited a gun which belonged to Security Engineers. |
| Y. | A notification to Dr. Eljack from the Alabama Department of Industrial Relations, dated October 9, 2001, informing him that his former employer, Security Engineers, had appealed in connection with a claim for unemployment compensation, claiming Dr. Eljack voluntarily quit. |

The remaining submissions and attached documents have been stricken, but the court has reviewed the documents. Most of the documents were already attached to the initial complaint, but the new documents, as discussed below, add nothing to support Dr. Eljack's claims. The Amended Complaint (Doc. 3) included these documents plus a notice of October 1, 2001, that Dr. Eljack's petition for writ of certiorari to the United States Supreme Court had been denied. Document 12 included the following additional documents:

A.	A fax transmittal from M.T. Goyne to Leslie Morris dated November 5, 2001, showing that the Eljack case was set for hearing on November 7, 2001, but not identifying what entity would be conducting a hearing.

B.	A "Communique" to Don Bottom dated July 2, 2001, in which Dr. Eljack stated that he had been in the field of "Security & Safety" since 1983 and desired a position in Quantitative and Qualitative Research Design for Increasing Business Profitability: (System Design - Synthesis and Analysis). He further stated that he had been removed from his regular work schedule at Metal Management and had thus been reduced to less than full time employment, although he had been requesting full time employment "for a long time" and that he needed a "full-large Size-uniform."

C.	The findings of the decision-maker as to Dr. Eljack's unemployment compensation claim, mailed November 16, 2001, and concluding that Dr. Eljack left his work voluntarily and without good cause. The examiner found Dr. Eljack left his work because he objected to signing the employee handbook and was concerned about shaving the beard he was required to wear for religious reasons. However, the examiner further found that Dr. Eljack had worn his beard during the whole of his employment and the employer would have made an exception for religious reasons had it been informed of the concern.

Document 25 included many previously-submitted documents and:

A.	From the Bible, 2 John 1:1 - 1:13.

B.	Security Engineer's formal response to Dr. Eljack's EEOC charge.

  C. An affidavit dated December 5, 2001, from Mim Goyne, Human Resources Manager for Security Engineers, and previously submitted by Security Engineers in support of its motion to dismiss. Ms. Goyne stated that Mawia Mohamed Eljack was employed by Security Engineers from May 8, 1997, through August 26, 2001, as a security officer posted at Alabama Metal Management, Inc., Southland Tube, Inc., and Svedala Industries. Ms. Goyne stated that Mr. Eljack voluntarily quit his employment. Dr. Eljack has placed a question mark in the margin near this last statement.

  D. A notice of determination of overpayment in the amount of $2016.00 from the Alabama Department of Industrial Relations, sent to Dr. Eljack on November 16, 2001.

  E. A notice of appeal rights from the Alabama Department of Industrial Relations, sent December 28, 2001.

  In addition to a selection of the above documents, Dr. Eljack attached to Document 27:

  A. A memorandum from Joel Morris to "Human Resources," dated August 4, 2001, and concerning Dr. Eljack in which Mr. Morris stated he went to Svedala Industries to train Mawia Eljack on key rounds on that date, but that Dr. Eljack was out of uniform in that his shirttail was not tucked in and his shirt was only partially buttoned. Mr. Morris issued a verbal warning and started the training but stated that Dr. Eljack continued to make legal threats against Security Engineers during the training.

  B. A note, dated September 22, 2001, from Shirley Thomas, who is otherwise unidentified, who stated that, while Mawia Eljack was working at Svedala Industries

he called and made threats toward Joel Morris and the company to the effect that "all he had to do was call his people and they would know how to take care of them for him, would take them out."

Document 42 includes more redundant submissions, and the following new documents:

A. Some documents drafted by Dr. Eljack but not shown to be addressed to anyone other than this court and submitted in opposition to summary judgment. These documents will be disregarded in considering the summary judgment motion.

B. A memorandum to Human Resources from Joel Morris, dated August 30, 2001, and providing that he had received a complaint from Southland Tube about Mawia Eljack being on the Southland Tube property with "two guys" after Southland Tube requested that Security Engineers keep him away. The margin is annotated, presumably by Dr. Eljack.

C. A letter addressed to Dr. Eljack from Louis Montgomery of Southland Tube, dated October 9, 2001, informing Dr. Eljack no positions were then available at Southland Tube.

D. The affidavits of Mim Goyne and Joel Morris submitted by Security Engineers in support of summary judgment, to which Dr. Eljack has added underlining and margin annotations.

E. A letter from a Birmingham attorney declining to represent Dr. Eljack.

F. A letter dated May 2, 2002, from the Alabama Department of Industrial Relations and addressed to the Jefferson County Circuit Court Clerk, regarding Dr. Eljack's claims.

G.  A missive dated July 31, 2001, from the human resources administrator for Southland Tube and stating that Dr. Eljack had been employed there for three years and "[w]e have been more than pleased with his services."

H.  Legal information downloaded from a web site.

I.  The various orders of this court, with underlining supplied by Dr. Eljack.

Having examined these documents attached to Dr. Eljack's submissions, without regard to admissibility[5] and viewing them in the light most favorable to the plaintiff, the court finds:

(1) Security Engineers is entitled to summary judgment as to any claim that Dr. Eljack was forced to leave his employment because his employer demanded that he shave his religious beard. There is no evidence anyone at Security Engineers specifically asked Dr. Eljack to shave his beard and there is no evidence Dr. Eljack conveyed his religious objections about shaving to the management of Security Engineers. There is no evidence Dr. Eljack told anyone at Security Engineers that he objected to signing the Employee Handbook or the particular clause requiring employees to be clean-shaven. There is no evidence any decision-maker knew Dr. Eljack was Moslem or that his religious faith required that he wear a beard. Finally, Dr. Eljack did not include the claim that he was forced to shave his religious beard in his EEOC complaint. For these reasons, the court finds defendant is entitled to summary judgment as to any claim that Dr. Eljack was constructively terminated due to his religion. *Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d

---

[5] Many of the documents are presented in inadmissible form and could be reduced to a form properly admissible at a trial. The court's discussion of the materials should not be interpreted as a conclusion as to the admissibility.

1301 (11th Cir. 2002) (setting out elements of religious discrimination claim and concluding that plaintiff had not established a prima facie case where there was no evidence employer knew he was an Orthodox Jew).

(2) Dr. Eljack has not established a prima facie case of discrimination with respect to wages or promotions due to his religion. Dr. Eljack initially applied for part-time work at Security Engineers and has offered no evidence that he applied for any available promotion and was turned down in favor of someone outside his protected class. In particular, there is no evidence Security Engineers ever had an opening requiring proficiency in qualitative or quantitative analysis. Furthermore, Dr. Eljack has not pointed to any person outside his protected class who received higher pay for similar work. Accordingly, Dr. Eljack has no evidence of disparate treatment with regard to promotions or wages and the defendant is entitled to summary judgment as to these claims. *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223 (11th Cir. 2002) (claim of disparate treatment discrimination requires employee to show employer treated similarly situated individuals outside of protected class more favorably).

(3) Though the court has not found a hostile work environment claim in Dr. Eljack's initial complaint or the EEOC charge, his general claims that corporate America limits opportunities for Moslems might be read as such a charge. Nevertheless, Dr. Eljack has not presented any evidence that he was harassed at Security Engineers because of his religion. Security Engineers acknowledges that Dr. Eljack received corrections about his uniforms, general appearance and work habits, but there is no evidence he was singled out for such treatment or that the treatment was otherwise due to discrimination. There is no

evidence that any supervisor or co-worker at Security Employees knew Dr. Eljack was a Moslem. Accordingly, Security Engineers is entitled to summary judgment as to any claim that Dr. Eljack was subjected to a hostile work environment because of his religion. *Rojas v. Florida*, 285 F.3d 1339 (11th Cir. 2002) (discussing elements of hostile work environment claim).

(4) Though the court has not found a retaliation claim in the initial complaint (Doc. 2) or EEOC charge, some of the documents filed by Dr. Eljack indicate he thought Security Engineers retaliated against him due to a complaint made to Don Bottom on July 3, 2001, by sending field inspectors to write him up on July 4, 2001, and by asking him to sign the employee handbook. However, the only document Dr. Eljack filed showing a complaint made prior to July 4, 2001, is the unnumbered "Communique" dated July 2, 2001, but not shown to be mailed by that date. (*See* Doc. 12 and attachments thereto). In that document, Dr. Eljack requested work in quantitative and qualitative research design, complained that he had been removed from his regular work schedule and reduced to part-time work, and requested a large uniform. None of these complaints constitute statutorily protected conduct. Furthermore, in view of the significant evidence that Dr. Eljack was insubordinate and hostile to his employer and to the management at the posts where he was assigned, a reasonable jury could not conclude that Security Engineers had a retaliatory motive in taking action with regard to Dr. Eljack during July and August of 2001. The temporal connection alone is insufficient to establish causation. Therefore, there is no evidence of a causal connection between Dr. Eljack's complaint and Security Engineer's actions in July and August of 2001. *Williams v. Motorola, Inc.*, _ F.3d _, 2002 WL 1987650 (11th Cir. Aug.

16

29, 2002) (record firmly reflected that employee was fired for insubordination and inability to get along with co-workers and superiors so that employee did not meet causation prong of the prima facie case on her retaliation claims).

(5) Finally, Security Engineers has documented several reasons for terminating Dr. Eljack's employment, none of which have been shown to be pretextual. First, Dr. Eljack failed to show up for work at Security Engineers after August 31, 2001, without excuse or explanation.[6] Second, Security Engineers has presented evidence that it terminated Dr. Eljack because he contacted Security Engineers' clients about employment concerns. Third, Security Engineers has presented evidence that it terminated Dr. Eljack because he did not tuck in his shirt or wear a complete uniform as required. Fourth, Security Engineers has presented evidence that it terminated Dr. Eljack for failing to perform his duties and for refusing counseling on areas in which he needed improvement. Finally, Security Engineers presented evidence that it terminated Dr. Eljack for failing to sign the Employee Handbook Acknowledgment Form after several opportunities and without offering any explanation. Dr. Eljack has not presented evidence showing any one of these explanations are a pretext for discrimination. *Lee v. GTE Fla., Inc.*, 226 F.3d 1249 (11th Cir. 2000) (discussing plaintiff's evidentiary burden in showing pretext).

---

[6] Ms. Goyne's August 20, 2001, letter to Dr. Eljack warned him that failure to sign the Employee Handbook acknowledgment form would result in "appropriate action, including, but not limited to, not assigning [Eljack] to any further work at Security Engineers . . . . " There is no evidence Security Engineers ever took this action. Rather, the undisputed evidence is that Dr. Eljack failed to go to his scheduled work after August 31, 2002, even though Ms. Goyne was willing to give him another appointment to read the handbook and sign the form.

17

## III. Conclusion.

For all the reasons stated herein, the plaintiff's submissions after document 2 will be stricken, the defendant's motion for summary judgment will be granted, and this action will be dismissed. A separate order will be entered.

Done, this 30th of September, 2002.

                                            EDWIN NELSON
                                UNITED STATES DISTRICT JUDGE